## Catania's Estate

Before Lamorelle, P. J., and Gest, Henderson, Van Dusen, Stearne and Sinkler, JJ.

VAN DUSEN, J., presiding judge.—On November 19, 1931, Salvatore Catania died, a widower, leaving to survive as those entitled to his estate as next of kin under the intestate laws six children, Biagio, Joseph (otherwise known as Giu-

seppe), Salvatore, Antonio, Maria (otherwise known as Mary Aquila), and Anna Caporale.

On December 12, 1931, the register of wills admitted to probate a paper dated March 14, 1931, as his last will and testament, and granted letters testamentary thereon to testator's eldest son, Biagio, who was named therein as executor.

On March 13, 1932, Maria Aquila, one of decedent's daughters, appealed from the decree of the register admitting the will to probate and granting letters testamentary thereon as above recited.

On April 18, 1932, the said Maria Aquila and Joseph Catania filed their petition praying that the appeal be sustained, the decree set aside, and an issue directed to the court of common pleas to try by jury:

(1) Whether or not at the time of execution of said writing the decedent was a person of sound mind;

(2) Whether or not the said writing was procured by undue influence, duress, and constraint practiced upon the said decedent by Biagio Catania and others;

(3) Whether or not the said writing is the will of the said decedent;

(4) Whether the said writing was duly executed by decedent.

On May 12, 1932, a joint answer was filed by decedent's four children, other than Maria Aquila and Joseph Catania.

On September 13, 1933, a formal replication was filed on behalf of the petitioners.

The appeal, being thus put in issue on petition, answer, and replication, was called to hear proofs on February 15, 1934.

By his will, Salvatore Catania gave his house to three children, Biagio, Antonio, and Salvatore, subject to the payment of legacies of $200 each to his children Guiseppe and Maria and $500 to his daughter Anna; gave his son Biagio the remainder of any death benefits after paying burial charges; and appointed Biagio executor and guardian of his son Salvatore. There is no residuary clause.

Testator was a widower and father of the above-named six children. He lived in the house referred to in the will, with his sons, Biagio, Antonio, and Salvatore. Joseph and Maria were married and lived in their own homes. Anna had lived with testator up to 6 or 7 weeks before his death, when she established another home with her husband. Joseph and his wife had also lived in the home until 8 or 9 months before testator's death. Testator was not affected with any disease and while past the prime of life was not materially impaired in mind or body. He could not read or write English and spoke only the Sicilian dialect. He conversed in this tongue with his family and fellow countrymen but could converse with others only with difficulty.

He could convey and apprehend ideas to some extent but not fully and accurately with exact distinctions of meaning. He was frequently intoxicated.

There were frequent dissensions in his family group; he frequently threatened to eject them from his home; and some of them he disliked more than others. There does not seem, however, ever to have been any physical violence. He was garrulous and apt to cling to an idea once he had formed it, and he was inattentive and irresponsive in conversation and of a testy temperament.

A number of witnesses testified that he frequently said that he would not make a will.

Taking up the issues seriatim:

Upon the most casual survey of the testimony produced, it is so barren of evidence of lack of testamentary capacity that it is unnecessary to review it. Lack of testamentary capacity cannot be inferred because he was garrulous,

insisted on repeating thoughts in his own mind rather than responding to conversation addressed to him, was testy in temperament and violent in speech—especially when excited by intoxicating drink. Such testimony would not overcome the presumption that every man is supposed to have testamentary capacity until the contrary is affirmatively established; and we have affirmative evidence in the testimony of several of testator's children and the subscribing witnesses to the will that he had testamentary capacity—in a manner of speech which was intelligible to his relative who was not only a subscribing witness but the scrivener of the will, and who was a fellow countryman who had been in close association with him when they were both boys in Sicily, who was his brother-in-law and a cousin of his (testator's) wife, who preceded the testator in emigrating to this country and received him when he came later and continued in intimate contact with him to some extent, a friendly adviser in business transactions during the time the testator had resided in this country.

It appears that testator was employed until the last few years of his life; that he handed his wages to his wife, who was the treasurer and general manager of the family; that after his wife's death his eldest son Biagio acted in this capacity. This was the usual family relation and not a confidential relation of such a character as to raise any presumption of undue influence. There is no evidence that Biagio had anything to do with the making of the will, or that testator was weak physically or mentally.

When he came to dispose of his house—his most important possession—he did not prefer his son Biagio before all the rest, but he preferred his three sons who were living with him in the house and, to a less extent, his daughter Anna, who was also living with him in the house, keeping house for him, before his two children who were married and living apart from him, though the latter were not altogether excluded. It is not to be expected that a man of the testator's culture, when he came to dispose of his estate, should be guided by mathematical calculations of degrees of relationship to him; it is altogether natural that his emotions should more actively intervene in favor of those children who were living with him for some years, had been in daily association with him, and rendered to him the care and assistance which a man of advanced years and impaired health must receive from those about him.

The will was actually written on the typewriter by Michael Angelo De Luca, who (as above stated) was a fellow countryman of the testator, who had preceded him to this country and looked after him when he arrived, who had married testator's sister, was a cousin of his wife, and had drafted his wife's will. De Luca was a man of some education and in particular could read and write English, and he was a person to whom the testator would naturally turn if he thought of making a will. He testified that the testator had spoken to him sometime beforehand about drawing a will, and, on March 14, 1931, testator visited his house in the evening and insisted that a will be written. He explained what he wanted in his own language, and De Luca wrote it out in English. The will as written was then read to testator in Sicilian dialect and was then executed by a mark in the presence of De Luca and his son, Charles A. De Luca, who was well known to the testator. The will was not read in the presence of the son. Both of these witnesses made a strong impression on me for reliability, and there was no testimony to contradict what they said.

The will is a natural one, in that it makes executor the eldest son, Biagio (who had had charge of the family exchequer and was general manager of the household since his mother's death), and gives some preference to the three children who remained at home, with perhaps a little additional preference to Biagio.

Had Biagio dictated the will or had Michael Angelo De Luca influenced the testator's mind to give an unfair advantage to Biagio, it is unlikely that the testator would have died intestate as to any part of his estate, which he appears to have done as to any part of the moneys due him in Italy which may not be required for the satisfaction of his debts.

There is no scintilla of evidence of duress or constraint practiced upon the testator by anyone in the making of the will. None of his children was present at the time of making the will, nor—as far as we know—were they aware that he intended to make a will until after it was fully consummated.

The only approach to a real issue is the doubt attempted to be cast upon the fact that it was testator's will at all. To raise this question, it is argued that testator frequently declared he would not make a will, and that there is testimony that Biagio suppressed knowledge of the existence of the will until Christmas day following testator's death. Biagio denies that he suppressed this will, and says that testator gave him the will when he returned to his own home after executing it; that he (Biagio) put it in his trunk and told his brothers and sisters, with whom he came in contact, about the existence of the will and the contents thereof a few days after testator's death; and announced it to the whole family at Christmas dinner. It is possible that a canny peasant, as the testator was, in order to avoid dissension in the family, said one thing and did another. It has happened before. I believe the subscribing witnesses, and there is nothing to submit to a jury upon which to disbelieve them.

It would have been more in accordance with custom and perhaps have forestalled some mushroom growths of suspicion had Biagio called the whole family together and read the will to them or have had copies thereof made and given one to each of his brothers and sisters as soon as convenient after the funeral. But failure of an executor to act in the most prudent and courteous manner is not sufficient ground to set aside a testator's disposition of his property.

At the close of the contestant's case, I announced my impression that no case had been made out and that if I still remained of that opinion the proponents would not be required to produce any evidence. If, however, for any reason I should be wrong, the case should be sent back for the hearing of the proponent's evidence.

After the hearing closed upon the presentation of the contestant's evidence only, I received an application from counsel for the contestants to permit the opening of the case to hear additional evidence. . . .

Contestants want to call as witnesses Joseph Catania and Mary Aquila, the contestants, and Joseph Aquila, husband of Mary Aquila, and "a barber assistant to Joseph Aquila, and some of the neighbors" who are unnamed, and it is proposed to prove that the testator, on the night and at the hour when the alleged will was allegedly executed, was not in the home of the scrivener De Luca, but was in the home of Joseph Aquila. It is said that this is after-discovered evidence, which could not have been obtained by diligence beforehand.

The will is dated, and the scrivener says that it was executed on the day that it bears date. Granting that the hour to which he testified was not previously known to the contestants, yet all three persons whose names are given as proposed witnesses were present in court and actually testified at the hearing. Of these Mary Aquila testified that she did not see her father, the testator, on March 14th. There was plenty of opportunity for them to have testified on the point, and no excuse for any failure to do so after De Luca testified and gave the hour. The failure to name the other proposed witnesses now, and the coupling of these other witnesses with those who might have testified and did not,

660

tends to discredit the whole application. Believing that reopening of the case under these circumstances is a matter of discretion, I decline to do so. . . .

*Thomas O. Haydock*, for exceptants; *C. James Todaro*, contra.

STEARNE, J., April 20, 1034.—We are not favorably impressed with the application of the contestants for the reopening of the hearing for the purpose of submission of alleged after-discovered evidence. The proofs submitted to the presiding judge of the allegations in the petition were obviously insufficient to award an issue devisavit vel non. Upon the conclusion of the hearing on February 15, 1934, counsel for contestants first asked for an opportunity of inspecting the typewriter upon which the will was alleged to have been typed. This opportunity was so afforded, and a sample of typewriting from this machine is attached to the record. On February 21, 1934, counsel for the contestants wrote a letter to the presiding judge, which is attached to this record, requesting the opportunity of producing additional evidence tending to establish that on the date on which the said will is alleged to have been executed decedent was at a different place than that testified to by the scrivener and the attesting witnesses. The presiding judge, properly regarding the request as a matter for the exercise of his discretion, declined to reopen the hearing.

Upon review of the evidence, we do not feel impelled to disturb the exercise of the discretion of the presiding judge. The original will, clearly revealing its purported date, has been of record since its probate on December 12, 1931. To regard evidence as after-discovered, it must be shown to have been actually discovered since the trial and such as could not have been obtained at the time of the trial by the use of reasonable diligence: Hysong v. Kenny Transfer Co., 304 Pa. 102; Hornick et al. v. Bethlehem Mines Corp., 310 Pa. 225.

We are of opinion that the contestants have been afforded a careful, thorough, and impartial hearing and, as it appears to us that the discretion of the court was not abused: Commonwealth v. Hine, 213 Pa. 97; Hunter v. Bremer, 256 Pa. 257; we will not overrule the exercise of his proper discretion.

The exceptions are dismissed.